UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| CHASTITIE C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:17 CV 94 (JMB) |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Deputy Commissioner of Operations, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On December 16, 2013, plaintiff Chastitie C. protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of November 15, 2013. (Tr. 120-123). After plaintiff's application for benefits was denied on initial consideration (Tr. 62-66), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 70-72).

Plaintiff and counsel appeared for a hearing on January 15, 2016. (Tr. 33-51). Plaintiff testified concerning her impairments, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Bob Hammond, M.A. The ALJ issued a decision denying plaintiff's application on June 24, 2016. (Tr. 12-22). The Appeals Council

denied plaintiff's request for review on October 23, 2017. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Deputy Commissioner's final decision.

## II. **Evidence Before the ALJ**

### A. **Disability and Function Reports and Hearing Testimony**

Plaintiff was born in April 1984 and was 29 years old on the alleged onset date. (Tr. 21, 138). At the time of the hearing, she lived with her four children, aged thirteen, twelve, ten, and eight, and friend Tressa Davis.[1] (Tr. 38). They lived in subsidized housing and received food stamps. She received special education services until she left school in the ninth grade. (Tr. 39). Although she took classes to earn a general education diploma, she did not complete the process and had no additional certification or training. She took the driver's license test more than three times before receiving a license in her late 20s. (Tr. 40). Plaintiff testified that she had attempted to work approximately 18 times but these jobs generally lasted only a few weeks. She had difficulty operating a cash register, processing credit card purchases, and making change. (Tr. 40-41). Plaintiff listed her impairments as depression, anxiety, borderline personality disorder, learning disabilities, and panic attacks. (Tr. 142).

Plaintiff completed her January 2014 function report with the help of a friend. (Tr. 164-74). Her daily activities included getting her children up and ready for school, attending to their homework, preparing meals, and watching a little television. She also spent three to four hours each day on household chores. She stated that her attention to her personal hygiene and appearance depended on her mood. She had difficulty sleeping because her "mind race[d]" when she was trying to fall asleep. (Tr. 165). She was able to drive but needed someone to go

---

[1] Plaintiff's living arrangements changed several times during the period under review in response to changes in her romantic attachments. In addition, she gave birth to her fifth child in March 2016. (Tr. 952).

2

with her when she went out "because of [her] anxiety." (Tr. 167). Plaintiff was able to walk for 10 to 15 minutes before she needed to rest. She went grocery shopping once a month, spending two hours on the task. She indicated that she was able to manage a savings account and checkbook, as well as count change, but was unable to pay bills. She also wrote, however, that making and counting change caused anxiety. Her hobbies included "hanging out with [her] kids" and "going out doing stuff together," but she had lost interest in doing this. (Tr. 168). She did not have close ties to family or friends and preferred to be alone because being around a lot of other people made her anxious. She also did not respond well to stress. Plaintiff had difficulties with walking, remembering, completing tasks, concentrating, following instructions, and getting along with others.

Plaintiff's friend Tressa Davis completed a third-party function report in January 2014. (Tr. 153-60). Plaintiff's daily activities consisted of getting her children ready for school, cleaning the house, and watching television. Plaintiff did not like to be around others or leave the house due to anxiety attacks. Ms. Davis listed plaintiff's impairments as sitting, understanding, talking, following instructions, hearing, completing tasks, getting along with others, and concentrating. In a narrative section, Ms. Davis suggested that plaintiff had some compulsions — she refolded the clothes repeatedly, vacuumed "all the time," and did not like others to clean or move things. In addition, plaintiff had a hard time concentrating and it took her longer to learn things. Finally, plaintiff always felt like she was sick. In May 2014, Ms. Davis and plaintiff's mother Kelly Ross completed questionnaires supplied by counsel. (Tr. 210-12, 214-16). They both stated that plaintiff was kept from working by her anxiety. According to Ms. Davis, plaintiff appeared stressed "all the time." (Tr. 212). She had learning disabilities that made it difficult for her to read and understand what she read. She also needed to have things

3

repeated to her. In addition, she complained about back and stomach pain and had difficulty eating. By contrast with Ms. Davis's earlier report, they reported that plaintiff had no difficulty with her personal hygiene.

Plaintiff testified at the January 2016 hearing that she experienced anxiety "every day[,] all day." (Tr. 42). The anxiety interfered with her ability to attend school functions with her children. She also had bipolar disorder and stated that she had manic phases, although she could not give an example. In addition, she was unable to get out of bed three or four days a week. On those days, her thirteen-year-old daughter was responsible for getting the younger children ready for school and fixing dinner. (Tr. 43-44). Plaintiff experienced migraines with light sensitivity two to three times a week. (Tr. 45). Her sleep was interrupted and she took naps about three days a week.

Vocational expert Bob Hammond was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to simple, routine tasks, not at a fast pace such as an assembly line, and who could tolerate occasional interaction with the public. (Tr. 49). According to Mr. Hammond, such an individual would not be able to perform plaintiff's past work as a cashier/checker.[2] Other work would be available in the national economy, such as cleaner II, car wash attendant, and laundry worker. (Tr. 50). All work would be precluded if the individual was off-task 20 percent of the day or absent three or more days per month.

---

[2] Mr. Hammond noted that plaintiff did not have past work of sufficient duration to classify, with the possible exception of a number of retail positions at places like Dollar Tree and Casey's. (Tr. 48-49).

4

B.   **Educational and Medical Evidence**

Plaintiff's sole claim is that the ALJ erred in failing to find that plaintiff met the criteria for Listing 12.05, intellectual disorders. Accordingly, the Court's review of the educational and medical records will be directed to the analysis of this claim.

1.   Education records

Plaintiff testified that she received special education services in school due to her learning disabilities. In response to a request for plaintiff's records, the Ralls County R-II school district reported that all "Special Ed. records have been destroyed." Thus, there are no records of any educational testing or individualized education plans. (Tr. 180). Report cards included in the record indicate that plaintiff earned As, Bs and Cs in grades 4, 5 and 6. (Tr. 184). In 7th grade, she earned Fs in at least two subjects, a trend that worsened in 8th grade. (Tr. 176-77). In 9th grade, plaintiff received a number of conduct offenses. (Tr. 178-79). She performed poorly on statewide standardized tests in 4th, 5th, and 7th grades, earning scores below the 20th percentile;[3] the sole exception was a score in the 32nd percentile in social studies/civics during her 4th grade year. (Tr. 182-83).

2.   Medical records

Plaintiff sought treatment for symptoms of anxiety, sadness, and anger in December 2013. (Tr. 266-68). She reported that she had been "fun-loving and outgoing" until 2008, when she lost a pregnancy. At present, she was struggling with a lack of structure and motivation. For example, she was studying for her GED but was having a hard time following through. She had previously been diagnosed with borderline personality disorder, panic disorder, and generalized anxiety disorder. The clinician diagnosed her with panic disorder without agoraphobia,

---

[3] Indeed, the majority of her scores were below the 10th percentile.

generalized anxiety disorder, and rule out post-traumatic stress disorder. Plaintiff's Global Assessment of Functioning (GAF) score was 50.

During the period under review, plaintiff received multiple services from the Mark Twain Behavioral Health Center, including community support, psychiatric, and nursing services.[4] (Tr. 916-18). On July 15, 2014, Ted Oliver, MSW, LCSW, completed an annual psychosocial assessment for plaintiff.[5] (Tr. 891-903). Plaintiff's stated reasons for participating in treatment included being "nervous all the time," with "constant" worry and an inability to relax. She complained of panic attacks, insomnia, constant worry and anxiety, low motivation, tiredness, and headaches. On mental status examination, plaintiff was noted to have normal appearance, motor activity, speech, and thought processes and content. Her interview behavior was described as "withdrawn," with a depressed, anxious mood and flat affect. Her intellect was described as normal, although she had poor insight. She drank alcohol only occasionally and had no history of substance abuse treatment. She had a brief incarceration in 2002 for driving without a license. She had no income and her father paid her utilities. She was able to shop for groceries, although she "hate[d] it," plan and prepare meals, drive, keep her belongings in order and manage her household without difficulty. She stated that she would like to maintain employment but always found it difficult due to anxiety. She also avoided interacting with others due to anxiety. Her diagnoses included generalized anxiety disorder and panic disorder without agoraphobia. Plaintiff was rated as having "severe" social network, occupational, economic, and family problems. Her current GAF was 37.

---

[4] Plaintiff's children also received services from Mark Twain Behavioral Health. See Tr. 885-86 (daughters had their own community support services worker while son saw psychiatrist Dr. Goldman).

[5] Mr. Oliver's notes refer to "last year's assessment," indicating that plaintiff had a long-standing treatment relationship with Mark Twain Behavioral Health. (Tr. 918).

Community Support Specialist Genia Perry, M.S., had more than 120 contacts with plaintiff between July 2014 and October 2015. The goals of treatment were to (1) help plaintiff reduce her anxiety and set reasonable goals and (2) maximize her independent functioning and community adjustment and functioning. See, e.g., Tr. 340 (July 24, 2014 notes). A review of the records establishes that plaintiff struggled with stress and anxiety arising from her romantic relationships, parenting, and insufficient finances. Plaintiff's strengths, as described by Ms. Perry, were: "She is motivated to receive services, she lives independently, she drives, she is able to discuss her thoughts and feelings, she attends to her ADLs, she enjoys being a parent." Id. Her weaknesses were: "She has had these problems since her teens, she is significantly isolated from family, she has few social supports, she is unemployed with no income." At no point in the extensive record did Ms. Perry identify cognitive impairments as a barrier to plaintiff's participation in treatment.

On April 20, 2015, psychiatrist David Goldman, D.O., of Mark Twain Behavioral Health, completed a psychiatric evaluation of plaintiff. (Tr. 872-76). She reported that she wanted help with her feelings, which she described as feeling numb, anxious, and overwhelmed all the time, with mood shifts. She stated that she had lost interest in doing things or going anywhere for the last 18 months[6] and that she only went out if she absolutely had to and had someone with her. On mental status examination, Dr. Goldman found plaintiff to be alert and oriented. She was able to identify the current president but not his predecessors, saying she hadn't paid any attention. She correctly spelled "world" without hesitation, but was unable to spell it backwards,

---

[6] As the ALJ noted, plaintiff's contention that she preferred to remain isolated was inconsistent with treatment notes. For example, plaintiff reported seeking out connections with new romantic partners on many occasions. See, e.g., Tr. 705 (spending a majority of her time texting and talking with people she meets online and in whom she has romantic interest); 746 (frustrated because she wants to spend more time with her friends and her son is being 'needy').

giving up after two attempts. She performed memory challenges without error. She indicated that her concentration was poor. Dr. Goldman diagnosed plaintiff with bipolar disorder II, not elsewhere classified, generalized anxiety disorder, and panic disorder with agoraphobia. (Tr. 874). He prescribed a trial of Latuda to treat her bipolar disorder but informed her that there were other options if it did not prove effective. She "expressed understanding and gave informed consent for a trial."[7] Id. at 875. On May 19, 2015, plaintiff told Dr. Goldman that she discontinued Latuda after one week because it made her sleepy. (Tr. 877-80). She also rejected the substitute medication, saying she "didn't even pick it up" from the pharmacy, but she was willing to try Abilify.[8] Her mental status examination was unremarkable, with the exception of limited insight and judgment. Dr. Goldman noted that plaintiff's cognition was normal. (Tr. 878). Her GAF score was 30.

    3.    Opinion evidence

On March 11, 2014, State agency consultant Mark Altomari, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 55-57). Dr. Altomari concluded that plaintiff had medically determinable impairments in the categories of 12.06 (anxiety-related disorders) and 12.08 (personality disorders) but found that there was insufficient evidence to determine the severity of any restrictions plaintiff experienced as a result of these impairments. He noted that Dr. Goldman had previously diagnosed plaintiff with borderline personality disorder and generalized anxiety disorder and that she had issues with

---

[7] One week later, plaintiff expressed concerns about the Latuda and two weeks later reported that she was fine without it and did not want to consider a substitute, with the exception of Klonopin, which she had previously reported was addictive for her. (Tr. 689, 693, 701).

[8] Two weeks later, plaintiff told Ms. Perry that she had not begun to take Abilify. (Tr. 731).

"therapy compliance" and had failed to appear for a consultative psychological examination. (Tr. 56). The ALJ assigned this opinion some weight. (Tr. 20).

During the January 2016 hearing, the ALJ granted counsel's prior request to send plaintiff for a psychological evaluation and cognitive testing. (Tr. 36-37, 241). On March 22, 2016, psychologist Thomas J. Spencer, Psy. D., completed that evaluation.[9] (Tr. 952-55). Plaintiff arrived at the evaluation early and alone after driving herself there. She reported that she ran her household, including preparing meals, performing housework and doing the laundry. Her daily routine consisted of getting up in the morning with the kids or to "holler at them to get up because I'm too tired or weak." (Tr. 954). She did busywork throughout the day while her children were in school. She identified her chief complaints as education, learning, and comprehension. She explained that "everything has to be slow-paced for me." She noted that, even with assistance, she struggled with reading, writing, and basic math. She had previously tried working as a cashier, a motel housekeeper, and at a screen printing company, but was unable to catch on to the requirements. Plaintiff also complained of anxiety, depression, and mood swings. On examination, she made intermittent eye contact and had flat affect. She cooperated and appeared to be a reliable historian, with "reasonably intact" insight and judgment. She was alert and oriented and showed no signs of psychosis or delusional thinking. Her flow of thought was intact. Dr. Spencer diagnosed plaintiff with bipolar disorder and anxiety disorder, not otherwise specified. He assigned a GAF score of 55-60.

Dr. Spencer administered the WAIS-IV test of cognitive functioning. Plaintiff received low scores on all subparts, placing her in the 1.0 percentile for verbal comprehension, the 0.1

---

[9] Plaintiff had given birth two weeks earlier to her fifth child, who remained in the hospital with a "heart concern." (Tr. 953).

percentile for processing speed, and the 0.3 percentile for perceptual reasoning and working memory, resulting in a full scale IQ of 52, a score within the 0.1 percentile. (Tr. 954). Although plaintiff "looked to put adequate effort" into the task, her scores were much lower than expected. Dr. Spencer concluded that plaintiff's score was not an adequate representation of her present functioning and, based on his interaction with her, opined that she "likely functions in the Low Average range of abilities." She appeared capable of managing her benefits without assistance.

Dr. Spencer completed a medical source statement of ability to do work-related activities. (Tr. 956-58). He opined that plaintiff had mild restrictions in the abilities to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions, and moderate limitations in the abilities to understand, remember, and carry out complex instructions, make judgments on complex decisions, interact appropriately with others, and respond appropriately to usual work situations or changes in a routine work setting. The ALJ gave Dr. Spencer's assessment great weight. (Tr. 19-20).

### 4. Evidence Submitted to the Appeals Council

On November 9, 2016, and at the request of counsel, Frank Froman, Ed.D., administered the Stanford Binet 5th edition to plaintiff, who attained a verbal IQ score of 51, a nonverbal IQ score of 51, and a full scale IQ of 48. (Tr. 28-29). Dr. Froman noted that plaintiff often "froze" while taking the test, staring at something and appearing lost unless he pushed her forward. "Where she could function, she appeared to do so quickly and completed the Binet in a manner suggestive of accuracy." Her scores on the Binet were consistent with those obtained on the WAIS-IV by Dr. Spencer. Dr. Froman opined that it was "unlikely that someone might be able to 'fake bad' on both" the WAIS-IV and Stanford Binet. He diagnosed plaintiff with mild to moderate intellectual disability, with a full scale IQ of 48. The Appeals Council found that "this

evidence does not show a reasonable probability that it would change the outcome of the decision." (Tr. 2).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations."

Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v.

Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since December 16, 2013, the application date. (Tr. 14). At steps two and three, the ALJ found that plaintiff had the following severe impairments: anxiety and bipolar disorder. The ALJ found that plaintiff's obesity, GERD, high cholesterol, and dental decay were not severe impairments because they did not result in any significant adverse effect on her functional abilities or normal movement patterns and did not significantly limit a work-related function. (Tr. 14-15). The ALJ next determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ found that plaintiff's mental impairments, considered singly and in combination, did not meet the listing criteria for listing 12.04 (affective disorders) or 12.06 (anxiety disorders). Id. at 15. For the purposes of

considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had mild restrictions in her activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. Id. at 15-16. Plaintiff had no episodes of decompensation. Id. The ALJ did not address Listing 12.05 (intellectual disorders), but discussed Dr. Spencer's findings in considering plaintiff's RFC.

The ALJ next determined that plaintiff had the RFC to perform a full range of work at all exertional levels but was limited to simple routine tasks not at a fast pace such as on an assembly line and with only occasional interaction with the public. (Tr. 16-17). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's own statements regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent with" the medical and other evidence, and found that the evidence "partially supports" plaintiff's allegations. (Tr. 18).

At step four, the ALJ concluded that plaintiff was unable to perform any past relevant work. Her age placed her in the "younger individual" category on the application date. She had a limited education and was able to communicate in English. (Tr. 19). Transferability of job skills was not an issue because plaintiff's past relevant work was unskilled. Based on the vocational expert's testimony, the ALJ found at step five that someone with plaintiff's age, education, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a cleaner II, car wash attendant, and laundry worker. (Tr. 19-20). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act, since December 16, 2013, the date of her application. (Tr. 20).

## V. Discussion

Plaintiff argues that the ALJ erred in failing to determine that plaintiff meets the criteria for Listing 12.05B, intellectual disorder.

Listing 12.05 includes the following diagnostic description for intellectual disability: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.05 (eff. May 24, 2016 to Sept. 28, 2016), 81 Fed. Reg. 66161. In addition to satisfying the diagnostic description, a claimant is required to meet an additional set of criteria. At the time the ALJ issued the decision in this case, Listing 12.05 had four sets of criteria, labeled paragraphs A through D. Paragraph B, on which plaintiff relies here, required a valid verbal, performance, or full scale IQ of 59 or less. Id. Plaintiff here argues that her scores on the WAIS-IV administered by Dr. Spencer meet the requirements for Listing 12.05B.[10]

While an IQ test is helpful in determining whether a claimant has a mental impairment, it is not dispositive, and other information illustrating a claimant's ability to function can be used to discredit the results of an IQ test. Evanoff v. Berryhill, No. 2:17 CV 41 JMB, 2018 WL 4489362, at *7 (E.D. Mo. Sept. 19, 2018) (citing Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004). "Indeed, [IQ] scores . . . should be examined to assure the consistency with daily activities and behavior." McKinney v. Colvin, 973 F. Supp. 2d 1011, 1026 (E.D. Mo. 2013)

---

[10] Plaintiff focuses her argument here on whether the IQ score obtained by Dr. Spencer is valid for the purposes of Listing 12.05. Plaintiff fails to address whether she demonstrated deficits in adaptive functioning initially manifested before age 22, as required by the introductory paragraph of the Listing. These requirements are mandatory. See Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) (in order to meet listing for "mental retardation," claimant must show: (1) a valid verbal, performance, or full scale IQ in the specified range; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.).

(quoting Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004)). An ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one time examination by a nontreating psychologist. Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005) (citing Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998)).

As noted above, Dr. Spencer concluded that plaintiff's scores on the WAIS-IV did not accurately reflect her intellectual functioning, which he assessed was actually in the low average range of abilities. The ALJ found that Dr. Spencer's assessment was consistent with other evidence in the medical record. The Court agrees. As discussed above, plaintiff received extensive treatment from multiple professionals at Mark Twain Behavioral Health, none of whom noted any concern with her intellectual functioning. To provide an example, on April 20, 2015, psychiatrist Dr. Goldman noted that he "drew [plaintiff] a diagram showing her moods above and below euthymia, discussing hypomania, mania, dysthymia, major depressive disorder as well as bipolar disorder type I, type II, and cyclothymia. **The patient expressed understanding and noted that she has had signs and symptoms congruent with mood fluctuations pointing to a bipolar disorder type II.**" (Tr. 875) (emphasis added). This level of understanding is inconsistent with someone whose intellectual functioning is in the .1 percentile.

The ALJ addressed plaintiff's contention that her school records supported a finding that her extremely low IQ scores adequately represent her true capacity. (Tr. 20). As the ALJ noted, plaintiff maintained good grades in her early school years and did not experience a decline until middle school. Even then, she earned some Bs and Cs in 8th grade. (Tr. 176). The ALJ noted that some of the decline in grades could be attributed to behavioral problems rather than a reflection of her intellectual functioning. The ALJ's analysis of plaintiff's school records is

16

consistent with other evidence in the record and the Court cannot find that the ALJ erred in rejecting plaintiff's argument.

It is also relevant that plaintiff did not claim mental retardation, or even borderline intellectual functioning, as an impairment when applying for SSI. McKinney, 973 F. Supp. 2d at 1026 (citing Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005)). She did claim learning disabilities and told Dr. Spencer that she had difficulty with reading, writing and basic math. These limitations, however, are not conclusive evidence of reduced intellectual functioning that precludes employment and are adequately addressed by restrictions in the RFC limiting plaintiff to simple routine tasks not at a fast pace.

Plaintiff relies on Dr. Froman's report that plaintiff's full scale IQ was 48. Dr. Froman's report was first submitted to the Appeals Council, which decided not to consider and exhibit it because it did not show a reasonable probability that it would change the outcome. (Tr. 2). Because the Appeals Council denied review after finding that the additional evidence did not "provide a basis for changing the [ALJ's] decision," the Court does not review the Appeals Council's decision to deny review, but rather determines if the record as a whole, including evidence that is new and material, supports the ALJ's determination. Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012). This analysis requires the Court to "speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing," which the Eighth Circuit has noted is "a peculiar task for a reviewing court." Adams v. Berryhill, No. 4:16-CV-2155-SPM, 2018 WL 4404722, at *9 (E.D. Mo. Sept. 17, 2018) (quoting Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994) and citing Van Vickle v. Astrue, 539 F.3d 825, 828 n.2 (8th Cir. 2008)).

The Court concludes that Dr. Froman's report would not have changed the ALJ's decision because the IQ scores he obtained were substantially similar to the scores the ALJ already considered and rejected. In addition, unlike Dr. Spencer, Dr. Froman failed to consider whether plaintiff's scores were consistent with her developmental history and functional limitations, as required by the regulations. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(d)(6) ("[S]ince the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.") Here, Dr. Froman apparently determined that plaintiff's scores were valid based on his observation that she made an adequate effort and that it is hard to "fake bad" across two different tests and achieve similar results. These observations are important but not sufficient to establish that plaintiff has a valid IQ score that satisfies the requirements of Listing 12.05B.

Plaintiff argues that her poor job history, her difficulty in attending her children's school functions, and her inability to get out of bed three or four days a week all support her contention that she meets Listing 12.05. [Doc. # 22]. These struggles are equally attributable to her anxiety and bipolar disorder, both of which the ALJ found were serious impairments and accommodated in determining plaintiff's RFC.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of November, 2018.